## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**MIGUEL and INGA GUTIERREZ,**

      **Plaintiffs,**

**vs.**                                              **No. CIV 06-0937 RB/WPL**

**THOMAS SCHWANDER, et al.**

      **Defendants.**

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Thomas Schwander's and Kerrin Schwander's Motion for Summary Judgment, filed January 15, 2008 (Doc. 226); Defendant Philip Simpson's Third Motion to Dismiss, filed April 7, 2008 (Doc. 342); Defendant Joan Brumage's Motion to Dismiss, filed April 8, 2008 (Doc. 350); Defendant Mark Bolinger's Motion for Summary Judgment, filed April 8, 2008 (Doc. 356), and Defendant Thomas and Kerrin Schwander's Third Motion for Summary Judgment, filed April 11, 2008 (Doc. 360). Jurisdiction arises under 28 U.S.C. §§ 1331 and 1367.

These five Defendants contend that they are entitled to judgment on Plaintiffs Miguel and Inga Gutierrezes' state-law claims for trespass against them under the doctrine of issue preclusion because a New Mexico state district court has ruled that a prescriptive road/trail easement, which led to property that is adjacent to the Gutierrez property and is owned by neighbors, John and Elizabeth Gordon, has existed across the Gutierrezes' property for more than ten years before and after the Gutierrezes purchased that property. Kerrin Schwander and Bolinger contend they are entitled to summary judgment on the Plaintiffs' claims for perjury, slander, or defamation because those claims arise out of their trial testimony in other state-court cases involving the Plaintiffs. Brumage contends that the Plaintiffs have failed to state a claim against her. The Schwanders also

contend that they are entitled to summary judgment on certain other state-law claims against them and seek another definitive ruling that the Gutierrezes' federal claims brought under §§ 1983 and 1985 against them have been dismissed.

The Court has carefully reviewed the Plaintiffs' second amended complaint and has considered the parties' submissions and the relevant law, and concludes that Simpson's, Brumage's, Bolinger's, and one of the Schwanders' motions should be granted and that the Schwanders' first motion for summary judgment should be granted in part and denied in part.

## I.    Legal Standards.

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party makes a summary judgment challenge, the opposing "party may not rest upon the mere allegations and denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if the evidence is "significantly probative" "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248-50.  Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment.  *See Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988).  In ruling on a motion for summary judgment, a Court does not weigh the evidence or make credibility determinations, *see Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001), but determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

2

*Anderson*, 477 U.S. at 251-52.  And in making this determination, the Court must construe all the facts in the record, as well as the reasonable inferences that can be drawn from those facts in a light most favorable to the nonmoving party.  *See Worrell v. Henry*, 219 F.3d 1197,1204 (10th Cir. 2000).

The Tenth Circuit has discussed the standard for granting a motion to dismiss, brought under Rule 12(b)(6), as follows:

> "We may uphold the grant of a motion to dismiss if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the non-moving party, the complaint does not contain 'enough facts to state a claim to relief that is plausible on its face.' " *Macarthur v. San Juan County*, 497 F.3d 1057, 2007 WL 2045456, at *5, 2007 U.S.App. LEXIS 17008, at *16 (10th Cir. 2007) (*quoting Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007)).  As we have explained this new standard for reviewing a motion to dismiss, "the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

*Anderson v. Suiters*, 499 F.3d 1228, 1232 (10th Cir. 2007) (emphasis in original).

> This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them.  "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." [*Twombly*, 127 S. Ct.] at 1965 n. 3.  *See Airborne Beepers & Video, Inc. v. AT & T Mobility L.L.C.*, 499 F.3d 663, 667 (7th Cir. 2007) ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.").  The *Twombly* Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies." 127 S. Ct. at 1971 n. 10.  Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin." *Id*.

*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).  Thus, in complex cases such as this one, in which numerous private and government actors are also sued in their individual capacities for both § 1983 claims and state-law torts, "it is particularly important . . . that the complaint make

clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250.

Due to Plaintiffs' pro se status, the Court liberally construes their complaint. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But "[t]he broad reading of the [pro se] Plaintiffs' complaint does not relieve the plaintiff of alleging sufficient facts on which a recognized legal claim could be based." *Id.*

> [T]he [pro se] plaintiff whose factual allegations are close to stating a claim, but are missing some important element that may not have occurred to him, should be allowed to amend his complaint. Nevertheless, conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based. This is so because a pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted. Moreover, in analyzing the sufficiency of the Plaintiffs' complaint, the court need accept as true only the Plaintiffs' well-pleaded factual contentions, not his conclusory allegations.

*Id.* (citations omitted).

By enacting 28 U.S.C. § 1738, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96 (1980). "[T]he preclusive effect of a state-court decision in a[n] [] action filed in federal court is a matter of state law." *Wilkinson v. Pitkin County Bd. of Comm'rs*, 142 F.3d 1319, 1322 (10th Cir. 1998). The Court thus looks to New Mexico law to determine the preclusive effect of a state-court ruling on the proceedings in this case.

> [T]he doctrine of collateral estoppel promotes judicial economy by preventing the relitigation of ultimate facts or issues actually litigated and necessarily decided in a previous suit. In order for the court to apply collateral estoppel, or "issue preclusion," the moving party must show that: (1) the party to be estopped was a party or privy to the prior proceeding, (2) the cause of action in the case presently before the court is different from the cause of action in the prior adjudication, (3) the

4

> issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation.  If the moving party demonstrates each element of this test, the court must then determine whether the non-moving party had a full and fair opportunity to litigate the issue in prior litigation.

*Rex, Inc. v. Manufactured Hous. Comm.*, 892 P.2d 947, 951 (N.M. 1995) (internal quotation marks, citation, and bracket omitted).

## II.    Allegations in the Complaint.

In the Court's Memorandum Opinion and Order, issued on April 9, 2008, the Court briefly summarized the genesis of the Plaintiffs' claims, as follows:

> Plaintiffs contend that, before they moved to the isolated community, their neighbors "constructed an illegal road through the [] property with no easements [to access private and BLM land]," and that, after the Plaintiffs moved there, fenced the property, and placed a locked gate to keep anyone from accessing the trail, the neighbors attempted to force the Plaintiffs to open it up to them through threats, harassment and other means.  . . . "[T]he defendants began a systematic physical invasion, invasion of privacy, physical attacks and filing criminal charges by false affirmations [based on] statements [by] Thomas Schwander."

April 8, 2008 Order at 9 (Doc. 357) (quoting the Plaintiffs' first Amended Complaint).  The "illegal road" the Plaintiffs refer to is a gravel road that leads from the development's main road, along and within the outer edge of the Plaintiffs' property, to the Gordons' property and then on to public BLM land.  The Court will refer to this road as the "Gordon Road."  In February 2005, the Gordons filed a civil suit in state court "citing interference with easement" to obtain a ruling on whether they and other members of the public had the legal right to use the Gordon Road.  *See* Second Amended Complaint at ¶ 73 (Doc. 168).

The Plaintiffs' Second Amended Complaint consists of eighty pages describing in minute detail the Defendants' alleged conduct.  The specificity of the complaint was made possible, in large part, by the Plaintiffs' extensive videotaping and photographing of their Defendant-neighbors, who are the Schwanders, the Gordons, and Joan Brumage.

5

**A.     Claims against the Schwanders.**

The Second Amended Complaint contains the following allegations against the Schwanders:

[Thomas Schwander] entered the Plaintiffs' property and threatened the Plaintiffs that they could not fence their property [when the Plaintiffs began fencing off the road easement the day after they closed on the purchase of the property.]  Doc. 168 at ¶ 40.

Schwander stated to the Plaintiff Miguel that he should go back where he came from [and] that the Plaintiffs would never keep him off of their property.  *Id.* at ¶ 43.

[T]here were numerous attempts to provoke the Plaintiffs by the Gordons and neighbors [including Thomas and Kerrin Schwander] by walking on the front of the Plaintiffs' property with weapons in a threatening manner, stopping, staring, photographing and anything else they could think of . . .  Plaintiffs were always being flipped off, spit at and laughed at by most of the people involved.  *Id.* at ¶ 56.

Schwander came to the Plaintiffs' property on his tractor [on February 5, 2005] armed with a gun and knife even though he'd been told to stay off our property and to never be armed on our property.  Schwander spewed epithets and ugly insults regarding both Plaintiffs.  He told Plaintiff Inga that he would do anything he wanted on Plaintiffs' property, then struck her with the drag on the tractor as he fled back to his property. . .  Miguel went to Schwander's property to tell him to stay away from his wife. . . .Miguel was later charged by the Sheriff's Department with assault on Thomas Schwander and found not guilty.  *Id.* at ¶ 68.

On March 2, 2005, Mrs. Gordon, along with the Schwanders and an unknown man driving their vehicle, trespassed in a flagrant parade, on foot, taking pictures yet again on Plaintiffs' property and of the Plaintiffs.  *Id.* at ¶ 75.

On April 11, 2005, Thomas Schwander filed citizen charges against Plaintiff Miguel, with help from the Sheriff's Department, for reckless driving.  The usual false witnesses of Mrs. Schwander and Mrs. Gordon tried to come forward.  Miguel was arraigned and released on $500 unsecured bond and put under more restrictions until Nov 2005, all because of more false charges by the controlling and exceedingly vindictive neighbors who wanted access across the Plaintiffs' property and demanded their "authority" be acknowledged.  At the Plaintiffs' arraignment on April 18, 2005, Mr. and Mrs. Schwander arrived with associates, Mr. and Mrs. Jim Chisum, to harass and disrupt the arraignment.  Again, Plaintiff was found not guilty.  Doc. 168 at ¶ 77.

On May 18, 2005, Mrs. Gordon came back on Plaintiffs' property with Thomas Schwander, heavily armed, taking more pictures of the same property.  *Id.* at ¶ 82.

On May 21, 2005, Gordon and Schwander came back on Plaintiffs' property again, heavily armed. This time Schwander had a camera too. Plaintiffs told them to get off their property but they didn't. *Id.* at ¶ 83.

On May 22, 2005 . . . the Gordons and Schwanders harassed the Plaintiffs by measuring and taking photos . . . .They were told to leave the Plaintiffs' property and Mrs. Gordon elbowed Miguel in the chest, who had gone to the side of the fence the trespassers were on. Thomas Schwander asked Miguel "how many more charges can you handle?" Mrs. Schwander, who was not present, called the Sheriffs Office again. *Id.* at ¶ 84.

On May 23, 2005, Gordon and Schwander again arrived to survey and measure Plaintiffs' property. *Id.* at ¶ 85.

On June 1, 2005, Mrs. Schwander began standing openly on her deck watching the Plaintiffs, seemingly every time she could see them. *Id.* at ¶ 87.

On June 13, 2005, Thomas Schwander trespassed across the Plaintiffs' property to access BLM land, armed as usual, to continue the harassment. He has plenty of ways to access BLM as he is surrounded by it. This was done multiple times for harassment purposes, along with walking with the addition of a rifle to the back of our property when the Plaintiffs' llamas would be out there, a place where they are out of Plaintiffs' sight, necessitating the Plaintiffs having to go guard them, which was Schwander's intent. Doc. 168 at ¶ 89.

Someone of unknown origin even entered hospital records in court files, for which there were no court orders or releases concerning Plaintiff Inga Gutierrez. Thomas Schwander attempted to use the medical records against the Plaintiff Miguel in the reckless driving charges. *Id.* at ¶ 93.

Mrs. Gordon and the Schwanders continue their harassment, even knowing that they are being videotaped the entire time. *Id.* at ¶ 103.

On April 7, 2006, . . . Thomas Schwander, both Mr. and Mrs. Gordon and two other people were standing on [the Gordons'] hillside. . . . As soon as Plaintiff Miguel left, the heavily armed Thomas Schwander . . .came walking down Plaintiffs' arroyo from a trail somewhere on Gordon's hill to the east, came up Plaintiffs' driveway and moseyed along trying to get a reaction from the Plaintiff Inga. When nothing happened, a few minutes later, Schwander and the two guests or visitors came walking across the front of Plaintiffs' property from the east. They stopped at Plaintiffs' first gate, which is around 100 feet inside Plaintiffs' property line and acted up, trying to draw Inga out. When they walked a little farther down the Plaintiffs' driveway, there was a lot of hand and arm waving as if they were making plans for the Plaintiffs' property, but that still got no reaction. The three of them then walked into the arroyo and were on Plaintiffs' property, just to a point you could see them, but not determine what they were doing. They then went farther west down the arroyo.

When nothing happened on the Plaintiffs' part, these 3 people walked back and on up to the Schwander home. *Id.* at ¶ 106.

On August 6, 2006, . . . Mrs. Gordon . . . returned with Mrs. Schwander from the Schwander's home . . . The women stopped their vehicle on the Plaintiffs' property and stared at [Miguel, who was walking around with a handgun, looking for a snake] for about 30 seconds. Mrs. Gordon stayed at her home, but Mrs. Schwander came right back out . . . . and stared at him for about a minute. *Id.* at ¶ 110.

On August 2nd, 8th and 9th, 2006, Mrs. Schwander was staring at the Plaintiffs from her deck . . . .. In addition, on the 9th of August, . . . Mrs. Schwander, seeing the Plaintiffs move toward the front of their property, raced out to her vehicle, raced down to the Plaintiffs' property and tried to block the Plaintiffs from getting out their first gate, which is 100 feet inside their property. Mrs. Schwander had acquired a video camera [and] video tap[ed] them while trying to block them from getting out on the front of their property . . . .[S]he was spewing indiscernible venom. She was parked on the Plaintiffs' private property for 3 minutes and 45 seconds. When Plaintiff Inga had enough and went through her gate to the backside of Mrs. Schwander's vehicle, Mrs. Schwander finally left and went to the Gordon's house. After she left Gordon's going back home, she stopped her vehicle just off the Plaintiffs' property and walked back onto their property again and began videotaping the property to the west and then went home. Doc. 168 at ¶ 114.

On September 20, 2006, . . . Mrs. Schwander again stared at Plaintiffs from her deck the entire time they were outside. On September 26, 2006, Mrs. Schwander again drove up and stopped on the Plaintiffs' property attempting to provoke a confrontation and continue the harassment and trespass with her video camera. She stayed parked for well over 4 minutes, video taping both Plaintiffs until she finally decided to leave. *Id.* at ¶ 116.

On October 5, 2006, at 12:18 p.m., Mrs. Schwander maliciously maneuvered her vehicle at the turn of Lower Cottonwood Trail and Laborcita Canyon Road in a manner to try and get the Plaintiffs' hit by an oncoming vehicle, deliberately endangering their lives. She was smirking even though she failed. *Id.* at ¶ 123.

On October 6, 2006, Ms. Schwander was staring at Plaintiffs from her deck until they went back inside their house. She was trying to make the Plaintiffs stare back by slamming a deck door repeatedly. *Id.* at ¶ 124.

On January 2, 2007, in the late afternoon, Ms. Schwander drove onto Plaintiffs' property, harassing their livestock guardian dogs, trying to cause the Plaintiffs' dogs to get out of the fence. When she succeeded with the alpha male, she left. *Id.* at ¶ 129.

On January 4, 2006, Ms. Schwander yelled over at Plaintiff Inga trying to get her to speak to her, knowing there is an order requiring no contact, which she tries regularly to instigate. *Id.* at ¶ 130.

On January 10 [and 13], 2006, Ms. Schwander drove to [Mrs. Brumage's] property, got her dog and walked her across our property to Gordon's, with her video camera pointed at the Plaintiff, trying to provoke her into speaking to her for a malicious purpose. *Id.* at ¶¶ 132, 133.

The Plaintiffs' federal claims against the Schwanders and all of the other Defendants brought under §§ 1983, 1985, the ADA, and the Fair Housing Act have been dismissed in prior orders, but because of the late stage of the litigation, the fact that the Gutierrezes have refused to acknowledge the dismissal of their federal claims against certain of the Defendants, and the significant financial expense, time, and energy the numerous private Defendants have expended to defend against the Plaintiffs' state-law claims, the Court has retained jurisdiction over the pendent state-law claims. *See United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002) (holding that, when federal jurisdiction is based solely upon a federal question, absent a showing that "the parties have already expended a great deal of time and energy on the state law claims, . . . a district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial").

The Plaintiffs contend they have a "malicious abuse of process" claim against the Schwanders because they "attempted to make criminal infractions out of the Plaintiffs' use of and right to private property." Doc. 168 at ¶ 232. Plaintiffs allege they have an "invasion of privacy" claim against the Schwanders because the Schwanders "portrayed [them] in a bad light and their standing and reputations were damaged in the community" and because they violated the Plaintiffs' "peace and tranquility" by taking pictures of them. *Id.* at ¶ 239. They allege a state-law trespass claim, citing N.M.S.A. § 66-7-10. *Id.* at ¶¶ 240-243. Their claim for "harassment and intimidation," which the Court also construes as an action for intrusion is based on their contention that the Schwanders "have participated in a campaign to isolate, slander, demean, threaten and drive the

Plaintiffs out of their choice of place in which to reside." *Id.* at ¶ 250.  They assert a claim for battery against Thomas Schwander arising from the incident in which he allegedly struck Inga with his tractor drag, and for assault against both of the Schwanders, "[a]ssault being the venomous insults spewing from the neighbor's mouths."  Doc. 168 at ¶¶  254, 257.  Their claims for "intentional infliction of emotional distress" and "outrage" are based on all the above-described conduct.  *See id.* at ¶¶ 258-59, 263-64.  Finally, they assert a claim against Kerrin Schwander for "perjury and false statements" for making "false statements under Oath . . . in multiple trials."  *Id.* at ¶ 268.

### B.    Claims against Philip Simpson.

The Court has, this same day, entered a memorandum opinion and order dismissing the Plaintiffs' claim for battery against Simpson.  As mentioned in that order, the Plaintiffs' second amended complaint describes Simpson as a bicyclist who "asked for permission to cross the Plaintiffs' property" on the Gordon Road to obtain access to BLM land and who "temporarily" received the requested permission.  Doc. 168 at ¶ 46.  The complaint states: "On May 15, 2005 multiple bicyclists raced through Plaintiffs' property . . . . Two of the trespassers were Phillip Simpson and Mark Bolinger who had been told repeatedly not to trespass." *Id.* at ¶ 80.  The only other factual paragraph mentioning Simpson also alleges only that he committed trespass.  *See id.* at ¶ 98.  The Plaintiffs list Simpson as a defendant in one of their trespass counts.  <u>See</u> <u>id.</u> at ¶ 269.

### C.    Trespass and perjury claims against Mark Bolinger.

Bollinger is also a bicyclist who had used the Gordon Road to access BLM land for many years before the Gutierrezes purchased the property.  The Second Amended Complaint contains the following allegations against Bolinger regarding the issues of trespass and perjury:

On January 23, 2005, three mountain bikers trespassed onto the Plaintiffs' property declaring they had the Gordon's permission to use Plaintiffs' property to access BLM land and for the Plaintiffs to get out of their way.  Doc. 168 at ¶ 62.

On May 15, 2005, multiple bicyclists raced through Plaintiffs' property striking Miguel in the back and yelling at the Plaintiffs to get out of their way. . . . Two of the trespassers were Phillip Simpson and Mark Bolinger who had been told repeatedly not to trespass.  *Id.* at ¶ 80.

On June 26, 2005, the Plaintiffs . . . were surprised by and physically attacked by three bicyclists, identified as Mark Bolinger, Brian Mike Nelson, Jr. and Duwayne Fritz.  This was an unprovoked attack by these trespassers on the Plaintiffs' property.  Mark Bolinger shoved his bicycle at Plaintiff Inga, screaming at her to get out of his way and then violently pushed her to the ground injuring her neck and back, rendering her to a semi-conscious state.  This attack resulted in 2 surgeries being performed on her.  Mark Bolinger stood over her with a t-post in his hand threatening to impale her while yelling at her when Plaintiff Miguel stopped him by taking him to the ground. . . . Plaintiffs Inga and Miguel were injured, but law enforcement instead arrested the Plaintiffs and jailed them, falsely charging them with numerous crimes and letting the perpetrating attackers go free.  *Id.* at ¶ 92.

Three bicyclists trespassed on Thanksgiving Day, 2005.  *Id.* at ¶ 95.

The Plaintiffs assert a claim against Bolinger for "perjury and false statements" for allegedly making "false statements under Oath . . . in multiple trials."  *Id.* at ¶ 268.  They also assert claims against him for trespass, *see id.* at ¶ 269, and for assault and battery and "injury to person and property" regarding the incident involving Inga, *see id.* at ¶¶ 271-272.

### D.    Claims against Brumage.

The Second Amended Complaint makes the following allegations against Brumage.

On June 11, 2005, Mrs. Brumage invited all the neighbors to her new home, except the Plaintiffs.  The Plaintiffs' only contacts with her had been cordial even though she acted strained.  Every neighbor glowered at the Plaintiffs' and had no justification for such behavior.  Doc. 168 at ¶ 88.

On July 7, 2006, . . . Joan Brumage . . . showed up for "the festivities" of the reading of the verdict [in the Plaintiffs' criminal jury trial involving the bicyclists].  *Id.* at ¶ 108.

On August 6, 2006, the entire neighborhood met at Mrs. Brumage's house across from the Plaintiffs again.  *Id.* at ¶ 110.

On August 7, 2006, Plaintiff Miguel shot a diamondback rattlesnake on the northwest side of his property. A co-conspirator neighbor, Ms. Brumage, immediately called the Sheriff's Office, who immediately sent two patrols. They stayed at her house about 12 minutes, but did nothing to the Plaintiffs who did nothing wrong, then or ever. Ms. Brumage certainly made the point clear that she would file charges on the Plaintiffs anytime she has a chance and has and is watching the Plaintiffs, along with the other neighbors. *Id.* at ¶ 111.

Ms. Brumage has taken over staring at the Plaintiffs' whenever the Gordons and Schwanders are unavailable and even when they are home. On November 8, 2006, the staring was so blatant the Plaintiffs had to return to their house. *Id.* at ¶ 127.

In December, Ms. Brumage walked with a contractor of some kind onto Plaintiffs' property, waiving her arms around and pointing all over the Plaintiffs front property. *Id.* at ¶ 128.

On January 21, 2007, Ms. Brumage walked her dog across the Plaintiffs' property to Gordon's in spite of the fact there are 5 posted signs prohibiting pedestrians. *Id.* at ¶ 135.

The Plaintiffs name Brumage, with several other Defendants, in a heading preceding several counts for relief in their second amended complaint. Count One is for violation of their constitutional rights. *See* Doc. 168 at ¶¶ 221-224. But the Court has already dismissed all claims related to violation of constitutional rights against all of the Defendants. Count Two is for conspiracy in violation of 42 U.S.C. § 1985, which the Court has already dismissed as well. The Court has similarly dismissed Count Three in this section of the Complaint against all Defendants. Count Four is for "Malicious Abuse of Process;" Count Five is for "Invasion of Privacy," and Count Six alleges "Trespass." The Court has already dismissed Count Seven, which is for violation of the Fair Housing Act. Count Eight alleges "Harassment and Intimidation;" Count Nine alleges "Assault and Battery," Count Ten alleges "Intentional Infliction of Emotional Distress", and Count Eleven alleges "Outrage."

### III.     Analysis.

#### A.     Trespass claims against these five Defendants are barred by collateral estoppel.

It is undisputed that the Plaintiffs' trespass claims against the Schwanders, Simpson, Brumage and Bolinger all relate to their use of the Gordon Road.  *See*, *e.g.*, Doc. 227, Ex. B at 2; Doc. 356, Ex. A.  It is further undisputed that "[t]he public [BLM] land [near the subdivision where the Gutierrezes' and Gordons' property is located] is landlocked by private property."  Plaintiffs' Resp. at 13 (Doc. 236).  The Defendants presented conclusive documentary evidence that, on November 14, 2007, the Twelfth Judicial District Court of the State of New Mexico held a trial on the Gordon's complaint for a declaratory judgment and permanent injunction regarding the Gordon Road.  *See* Doc. 227, Ex.  A at 1-2.  The state court specifically found that the Plaintiffs had been given written notice of the trial date, but that they did not appear for the trial.  *See id.*

The state court made the following findings and conclusions:  the Gordon Road "was in existence in 1992" when the Gordons moved onto their property, *id.* at 3; the Gordons had used the Gordon Road for an uninterrupted, peaceful, and continuous period of more than ten years, *see id.* at 3-4; the Gordon Road was "obvious when viewing the area" and also had been used by other motorists, pedestrians, and bicyclists to access federal land, *id.* at 4; the Gordons had established "by clear and convincing evidence" a permanent prescriptive easement, consisting of at least the dimensions of the gravel road that had been marked on a 1998 survey of the land, which burdened the Gutierrezes' property for the benefit of the Gordon property, *id.* at 1, 4-5; the Gutierrezes had "installed fences and signage which obstruct and impead [sic] the use of the prescriptive easement" and those fences and signage had to be removed within thirty days of the entry of the order of Judgment, *id.* at 5; the Gutierrezes could not "interfere, harass, intimidate, or otherwise disturb" either the Gordons' use of the Gordon Road or the use of the Gordon Road by others using it

13

"consistent with the prior practices for the period of ten (10) or more years," *id.* at 6; and that the Gutierrezes could not interfere with the survey, maintenance, or continuing existence of the Gordon Road, *id.*   The Gutierrezes acknowledge that the state court's final judgment relates to their trespass claims, but contend that it is "unconstitutional and on appeal,"  Doc. 227, Ex. B at 2 (Pls.' Resp. to the Gordons' Req. for Admissions), and that "it is unlawful . . . [and] not retroactive," Doc. 236 at 1 (Pls.' Resp.).

New Mexico follows the Restatement (Second) of Judgments § 13 on the issue whether a judgment that has been appealed has preclusive effect in subsequent judicial proceedings. *See Brunacini v. Kavanagh*, 869 P.2d 821, 827-28 (N.M. Ct. App. 1993).   Comment f to this Restatement states:

> The better view is that a judgment otherwise final remains so despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo; finality is not affected by the fact that the taking of the appeal operates automatically as a stay or supersedeas of the judgment appealed from that prevents its execution or enforcement, or by the fact that the appellant has actually obtained a stay or supersedeas pending appeal.
>
> The pendency of a motion for new trial or to set aside a judgment, or of an appeal from a judgment, is relevant in deciding whether the question of preclusion should be presently decided in the second action.  It may be appropriate to postpone decision of that question until the proceedings addressed to the judgment are concluded.

The New Mexico Court of Appeals held "that application of the principles set forth in comment F of the Restatement, . . . are [sic] consistent with New Mexico precedent and the goal of fostering judicial economy." *Brunacini*, 869 P.2d at 828.  The Court, therefore, will examine the Plaintiffs' contentions, both to determine whether to postpone the decision on the preclusive effect of the state-court ruling and whether the state-court ruling has preclusive effect in this case.

14

The basis for the Plaintiffs' claim that the state-court judgment should not be given preclusive effect is three-fold.  They argue that they "had no chance or any reasonable opportunity to defend the state action as the judge ignored all of the evidence submitted by the Plaintiffs along with their demand for judgment as a matter of law . . . .  He also ignored all pleadings, including a Summary Motion by the Plaintiffs, a Judicial Notice and a demand for Change of Venue."  Doc. 236 at 1-2.  But the Plaintiffs, themselves, submitted evidence that they had notice and took the opportunity to defend against the Gordons' action and that the state-court judge issued rulings on their motions before setting the matter for trial and did not "ignore" their filings.  *See id.*, Ex. 9. Further, the fact that a judge disagrees with a party's position and denies their motions does not mean that the party has not had a full and fair opportunity to defend an action; otherwise, one party in every lawsuit could make that claim.  Nor does disagreement with one party's position mean that the judgment is unlawful or invalid; if it did, all judgments would be unlawful or invalid.

The Plaintiffs also contend that the state-court judgment was unlawful because their appeal of a foreclosure action on their property was at issue in the United States Supreme Court at the time the judgment was issued, and therefore, the state court did not have jurisdiction over the case.  But the documents the Plaintiffs submit establish the contrary: the New Mexico Supreme Court denied certiorari in the foreclosure case on August 8, 2007, *see* Doc. 237, Ex. 9 at 2, and the Plaintiffs did not submit a petition for certiorari to the United States Supreme Court until December 28, 2007, over a month after the final judgment in Gordons' easement suit had been filed, *see id.*, Ex. 10 at 2-3.

The Plaintiffs contend that, because the state-court judgment is "unconstitutional," in their opinion, it is "null and void."  Doc. 237 at 1.  Their apparent support for this statement is their contention that the state-court judgment is wrong because

15

> the district judge ignored all the constitutional violations, the Plaintiffs' rights and
> as well as the New Mexico State laws and federal regulations.  Subdivision laws
> have been violated and the fact that the judge made only the Plaintiffs' property
> available to the public and not the other private properties that are crossed before
> coming to the Plaintiffs' property clearly shows a violation of equal treatment and
> flies in the face of all reason.

Doc. 237 at 4.  But there was no evidence that any other property owner, *other* than the Gutierrezes ever challenged the public's right to use the Gordon Road, so the issue before the district court was a narrow one:  had there been a prescriptive, peaceable use of a portion *of the Gutierrez property* by the Gordons and the public that was open and obvious for more than 10 years such that the Gordons and the public, who had been using the property to obtain access to private property and BLM land and for recreational purposes, had the legal right to permanently continue that use without interference from the Gutierrezes?  The Gutierrezes waived their right to present and question witnesses at the state-court trial by refusing to take part in that trial even after the New Mexico Supreme Court had denied their appeal in August 2007, and they cannot now relitigate the issue whether the Schwanders, Brumage, Simpson, Bolinger, and other neighbors and bicyclists were lawfully using the Gordon Road or were trespassers.

Because (1) the Plaintiffs were parties to the prior proceeding in state court, (2) the cause of action in the case presently before the Court is different from the cause of action in the state-court adjudication, (3) the issue of lawful use of the Gordon Road by the Plaintiffs' neighbors and the public was actually litigated in the prior adjudication, (4) that issue was necessarily determined in the prior litigation, and (5) the Plaintiffs had a full and fair opportunity to litigate the issue in the prior state-court litigation, the Court concludes that the doctrine of issue preclusion bars relitigation of the trespass claims against these Defendants and their trespass claims must be dismissed.  *See Rex, Inc.*, 892 P.2d at 951.

16

**B.      Perjury/slander/defamation claims must be dismissed because they are based on testimony in judicial proceedings.**

"There is an absolute immunity from liability for defamatory statements made in court proceedings . . . ." *Zuniga v. Sears, Roebuck & Co.*, 671 P.2d 662, 665 (N.M. Ct. App.1983).  The Plaintiffs contend that the "complaining witness" exception applies, but they have conflated the tort of malicious abuse of process, where the complaining witness who has wrongfully and maliciously caused the instigation of legal proceedings against another may be held liable for that tort if all of the other elements are satisfied, with the separate tort of slander/defamation, where all witnesses in judicial proceedings, whether they are a complaining witness or not, have absolute immunity from liability for the tort of slander or defamation.  *See, e.g., Stryker v. Barbers Super Mkts, Inc.*, 462 P.2d 629, 630 (N.M. Ct. App. 1969) (stating, that, "[g]enerally, defamation in judicial proceedings is privileged even though the defamation is false or malicious" and affirming dismissal of claim against the complaining witnesses who had previously filed suit against the individual who was the plaintiff in the second, slander/defamation case).  Therefore, both Kerrin Schwander and Mark Bolinger are absolutely immune from liability on claims for perjury, slander, or defamation for alleged false statements they made in judicial proceedings.

**C.      The Schwanders have not established entitlement to judgment on the Plaintiffs' claims for malicious abuse of process.**

The Plaintiffs' second amended complaint bases a malicious abuse of process claim on Thomas Schwander's alleged filing of "citizens charges" against Miguel for reckless driving in April 2005.  Doc. 168 ¶¶ 77, 232.  The complaint also alleges that "Miguel was . . . charged by the Sheriff's Department with assault on Thomas Schwander and found not guilty." *Id.* at ¶ 68.  The Schwanders do not address either claim in their motion for summary judgment and have not satisfied their burden under Rule 56.

**D.    The Plaintiffs have not alleged sufficiently outrageous behavior by the Schwanders to establish the torts of intentional infliction of emotional distress or outrage.**

The following elements must be proven to establish a claim of intentional infliction of emotional distress:

> (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the Plaintiffs' mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress.  The Restatement describes extreme and outrageous conduct as that which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
>
> As a threshold matter, the trial court should determine as a matter of law whether the conduct at issue reasonably may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress.  When reasonable persons may differ on that question, it is for the jury to decide, subject to the oversight of the court.

*Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 41 P.3d 333, 342-43 (N.M. 2001) (quotation marks and citations omitted).

The Plaintiffs complain of the following conduct: (i) warning the Plaintiffs that they could not build a fence across the Gordon Road, (ii) continuing to use the Gordon Road for recreational walking and access to the Gordon's residence, despite the Plaintiffs' claim of exclusive right, (iii) taking photographs of interactions with the Plaintiffs after the relationship with them went sour, (iv) "spewing indiscernible venom" or using foul language or insulting the Plaintiffs on two or three occasions during conflicts with the Plaintiffs, (v) measuring or surveying the disputed property-easement area, (vi) staring at the Plaintiffs from the Schwanders' deck or from the Gordon Road, (vii) unsuccessfully trying to "block" the Plaintiffs from getting out their front gate for four minutes, (viii) unsuccessfully maneuvering a vehicle at a turn in the road in a manner that risked the Plaintiffs being hit by an oncoming vehicle, (ix) videotaping the property after the dispute over the easement

18

arose, (x) "harassing" the Plaintiffs' dogs by driving onto the property, and (xi) "yell[ing] over at Plaintiff Inga trying to get her to speak to her, knowing there is an order requiring no contact.[1]"

The Plaintiffs have submitted medical records in response to the motion for summary judgment in which Inga reported to her medical caregivers on two occasions that she had been "yelling, calling out derogatory names, and swearing at those she believes are intruding on her (and her land)."  Doc. 257, Ex. 7 at 1, 2.

The Court agrees with the Schwanders that the Defendants' alleged acts are not so outrageous or extreme that they go beyond all bounds of decency under the circumstances in this case, where the Plaintiffs and the Defendants were all openly hostile to one another almost immediately after the Plaintiffs moved to the area and changed the Defendants' long-standing practice of using the Gordon Road.  Although it is undisputed that Thomas Schwander carried a holstered handgun whenever he walked in the area and on the Gordon Road, in the circumstance in which Miguel admits that he also carried a handgun and a rifle because they are necessary to kill rattlesnakes that abound in the area, in the absence of any allegations that Thomas Schwander actually threatened the Plaintiffs with the gun, the act of openly carrying a gun is not outrageous behavior.  As a matter of law, the Court concludes that the Plaintiffs have not described conduct by the Schwanders that "may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress" or of outrage.  *Trujillo*, 41 P.3d at 343.

E.     **The Schwanders have not demonstrated entitlement to judgment on the invasion-of-privacy claim.**

Establishing the tort of invasion of privacy, however, appears to be less demanding. Damages are available "for the intentional intrusion on a person's privacy, and are directed primarily

---

[1]  Plaintiffs apparently are referring to an order in the Gordons' state-court suit.

at compensating for mental injury, or injury to feelings resulting therefrom," and a plaintiff need not

establish malice on the part of the defendant. *Apodaca v. Miller*, 441 P.2d 200, 204 (N.M. 1968).

New Mexico recognizes four categories of invasion of privacy, including the tort called "[i]ntrusion.

This tort, distinct from but related to trespass, involves an invasion of the plaintiff's 'private' space

or solitude-eavesdropping on private conversations or peeping through the bedroom window, for

example." *Moore v. Sun Pub. Corp.*, 881 P.2d 735, 743 (N.M. Ct. App. 1994) (internal quotation

marks and italics omitted); *see also McNutt v. N.M. State Tribune Co.*, 538 P.2d 804, 807 (N.M. Ct.

App. 1975) (characterizing the general tort of invasion of the right of privacy as "the right to be let

alone").

     In analyzing the tort of intrusion under New Mexico law, the Tenth Circuit has stated that

> [t]he comments to the Restatement are particularly helpful, suggesting that
> the tort of intrusion becomes actionable only when it is deemed "highly offensive to
> a reasonable person," and usually involves a physical invasion into someone's space.
> Restatement § 652B & cmts. b and d.  "The invasion may be by physical intrusion
> into a place in which the plaintiff has secluded himself, as when the defendant forces
> his way into the Plaintiffs' room in a hotel or insists over the Plaintiffs' objection in
> entering his home." *Id.* cmt. b. "[T]here is no liability for knocking at the Plaintiffs'
> door, or calling him to the telephone on one occasion or even two or three, to
> demand payment of a debt.  It is only when the telephone calls are repeated with
> such persistence and frequency as to amount to a course of hounding the plaintiff,
> that becomes a substantial burden to his existence, that his privacy is invaded." *Id.*
> cmt. d; *see also* Prosser & Keeton § 117, at 855 ("[t]here is no tort when the landlord
> stops by on Sunday morning to ask for the rent").

*Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1217 (10th Cir. 2007).

     In support of their motion for summary judgment on the intrusion claims, the Schwanders

state only that the Plaintiffs "cannot reasonably contend that photographs taken on public property

constitute an 'invasion' of private space or property." Doc. 227 at 3.  But the Plaintiffs have alleged

that the Schwanders also used binoculars to spy on them, repeatedly took pictures of them while

they were on their private property minding their own business, trespassed on the Plaintiffs' property

located in an arroyo (as opposed to the Gordon Road) in order to try and get the Plaintiffs to react

to them, and used a video camera for minutes at a time to try and provoke and harass the Plaintiffs.

The Court cannot say that a jury, if it believed the Plaintiffs' version of events, could not find that

the Schwanders' repeated, persistent, and frequent photographing and videotaping constituted the

tort of intrusion.  The Court will deny the motion for summary judgment on this claim.

       **F.**      **The Plaintiffs have failed to state a claim against Brumage regarding**
                   **Counts 4-5 and 8-11.**

       The only counts that have not yet been dismissed against Brumage are Count Four -

"Malicious Abuse of Process," Count Five - "Invasion of Privacy," Count Eight - "Harassment and

Intimidation," Count Nine - "Assault and Battery," Count Ten -"Intentional Infliction of Emotional

Distress," and Count Eleven - "Outrage."  The Court concludes that the Plaintiffs' complaint does

not state sufficient facts to support any of these state-law claims.  There are no allegations that

Brumage filed charges against the Plaintiffs; that she repeatedly and persistently intruded upon their

privacy by photographing, videotaping, or unlawfully trespassing on their property; that she ever

harassed or intimidated them in any manner; that she ever assaulted or touched them; or that she

engaged in any conduct that was so extreme and outrageous that it would permit recovery under the

tort of intentional infliction of emotional distress or of outrage.

       Contrary to the Plaintiffs' contentions in their response brief, it is neither wrongful nor illegal

to choose to socially exclude a neighbor from a private gathering, to peaceably seek continuing

access to, or to use, a road that has long been used by the public, to call police to investigate

gunshots, or to attend the public reading of a jury verdict.  Nor does the complaint allege any facts

indicating that Brumage "clearly was one of the Defendants physically invading and seizing the

Plaintiffs' [sic] property," that she "attempt[ed] to jail the Plaintiffs again," that "she initiated a

vicious and false complaint against the Plaintiffs," or that she "used her credentials against the Plaintiff to try and deprive the Plaintiffs of their property."  Pl. Resp. (Doc. 365) at 1-5.  The Plaintiffs have, therefore, not satisfied their burden to allege "enough facts to state a claim to relief [against Brumage] that is plausible on its face."  *See Twombly*, 127 S. Ct. at 1968-69.  The Court will not extend yet a third opportunity for the Plaintiffs to amend their complaint because they were fully aware of all the facts regarding Brumage's alleged involvement in the conflict between the Plaintiffs and their neighbors when they filed their second amended complaint, but are not close to stating a plausible claim for relief against her.  *See Bellmon*, 935 F.2d at 1110.

**IT IS ORDERED** that Defendants Thomas Schwander's and Kerrin Schwander's Motion for Summary Judgment (Doc. 226) is granted in part and denied in part and that judgment is granted in favor of Defendants Thomas Schwander and Kerrin Schwander on Plaintiffs' claims for trespass, intentional infliction of emotional distress, outrage, and slander/defamation/perjury;

**IT IS FURTHER ORDERED** that Defendant Philip Simpson's Third Motion to Dismiss (Doc. 342) is granted and the trespass claims against Defendant Philip Simpson are dismissed with prejudice;

**IT IS FURTHER ORDERED** that Defendant Joan Brumage's Motion to Dismiss (Doc. 350) is granted and that all claims against Defendant Joan Brumage are dismissed with prejudice;

**IT IS FURTHER ORDERED** that Defendant Mark Bolinger's Motion for Summary Judgment (Doc. 356) is granted and that judgment is granted in favor of Defendant Mark Bolinger on claims for trespass and slander/defamation/perjury; and

**IT IS FURTHER ORDERED** that Defendants Thomas and Kerrin Schwander's Third Motion for Summary Judgment (Doc. 360) is granted and judgment is granted in favor of Defendants Thomas and Kerrin Schwander on all federal claims, including conspiracy.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**